**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | |
|---|---|
| STATE OF WASHINGTON, | No. 85461-5-I |
| Respondent, | (consolidated with Nos. 84493-8-I, 85292-2-I) |
| v. | DIVISION ONE |
| RONNIE LYNN ATER, JR., | UNPUBLISHED OPINION |
| Appellant. | |

MANN, J. — Ronnie Ater Jr. was convicted after a bench trial of one count of possessing depictions of minors engaged in sexually explicit conduct in the first degree. Ater appeals and argues (1) the trial court erred in refusing to suppress evidence discovered through the warrantless search of his phone, (2) his constitutional rights were violated when he was ordered to be restrained and then remained restrained during multiple hearings, and (3) the victim penalty assessment (VPA) and DNA collection fee should be stricken. Ater also raises multiple issues in a statement of additional grounds (SAG). We remand for the limited purpose of striking the VPA and DNA collection fee. We otherwise affirm.

I

A

In October 2018, Special Agent Toby Ledgerwood from the Department of Homeland Security Investigations received information from the Royal Canadian Mounted Police about a video uploaded to the instant messaging application Kik, that contained a depiction of a minor engaged in sexually explicit conduct. The video had been disseminated from Ater's cellphone on an IP (internet protocol) address in Concrete, Washington. While Ater was the primary suspect at the time, because there were two sex offenders residing at the physical address for the IP address, Ater was not the only potential subject.

On November 8, 2018, Agent Ledgerwood, and Detective Duane Neufeld of the Skagit County Sheriff's Office, contacted Ater at his home. Agent Ledgerwood and Detective Neufeld, dressed in civilian clothing, knocked on Ater's door. After Ater answered the door, the officers told him that he may be a victim of a crime or that someone may be using his Kik account. Ater was told that he was not in trouble, but they hoped to speak with him. Because it was cold outside, the officers offered to speak with Ater inside Agent Ledgerwood's unmarked Jeep. Agent Ledgerwood sat in the driver seat, Ater sat in the front passenger seat, and Detective Neufeld sat in the back seat. The doors were not locked.

Once they were inside the vehicle, the officers began an audio recording of their conversation.[1] The officers advised Ater that he was free to leave at any time. They

---

[1] Unless otherwise noted, the facts surrounding the recording are derived from the trial court's findings of fact in the suppression order that were not challenged on appeal. Unchallenged findings of fact are verities on appeal. State v. O'Neill, 148 Wn.2d 564, 571, 62 P.3d 489 (2003).

initially inquired about his e-mail addresses, apps he used on his phone, how long he had the phone, and other questions unrelated to child pornography. The officers informed Ater that he was not under arrest and was free to go any time he wanted.

At around 6 minutes into the recording, the officers first raised the topic of child pornography. They mentioned they could apply for a search warrant but that it would not be guaranteed that they would receive one. Questions then became specific about child pornography. Ater continued to deny that he had any possession of child pornography. At 8:42 minutes into the conversation, the officers told Ater that they did not want to have to go around and talk to other people about the video. The officers also mentioned again the possibility of applying for a search warrant, but they did not know if they would receive one.

The next part of the recording is disputed by the parties. The trial court found that at 9:20 minutes into the recording, Agent Ledgerwood asked Ater if he would mind if they looked at his cell phone, and Ater responded "yeah" and handed his phone over. The officers did not advise Ater that he had the right to refuse consent. Agent Ledgerwood scrolled through Ater's phone for over a minute. He asked Ater about different apps that Ater did and did not have on his phone.

The next part of the recording is not disputed. At 10:41 minutes into the recording, Agent Ledgerwood asked Ater where his "regular porn" is and if Ater could show them. Agent Ledgerwood handed the phone back to Ater. Ater then went into a folder on his phone, entered a separate password, and started showing officers the type

of pornography stored on his phone. At some point while Ater scrolled, the officers observed an image from the video they were investigating.

At 11:10 minutes into the recording, Ater told the officers he had "stuff like that" on his phone, and one of the officers asked if he could "see that" referring to the phone. Ater responded "I don't really wanna." At this point, Detective Neufeld had taken Ater's phone and looked through the settings trying to disable the password function on the folder with the suspected child pornography. At 17 minutes into the recording, Ater asked to have his phone back. Detective Neufeld placed the phone on the center console where Ater recovered it. Agent Ledgerwood later formally seized the phone and continued to ask Ater about the suspected child pornography the officers saw on the phone. Ater eventually admitted to viewing the video.

The State charged Ater by amended information of one count of possessing depictions of minors engaged in sexually explicit conduct in the first degree.

B

Ater moved pretrial to suppress all evidence found on his phone arguing that it resulted from an unlawful search. He argued that consent was not clearly expressed, and in any event, consent was terminated prior to Agent Ledgerwood discovering the images. He also argued that he should have been given Ferrier[2] warnings.

After hearing testimony and reviewing the recording, the trial court entered its decision. The court identified three times when the officers took possession of the phone: (1) after Ater was asked if he minded them looking at his phone and he handed

---

[2] State v. Ferrier, 136 Wn.2d 103, 118, 960 P.2d 927 (1998).

it to Agent Ledgerwood; (2) after Ater told the officers "I don't wanna" in response to them asking him if they could take another look; and (3) after Agent Ledgerwood ultimately seized the phone. Only the first two were subject to the motion to suppress.

The trial court denied suppression as to the first search. The court concluded that Ferrier warnings were not required and that Ater voluntarily handed his phone to Ledgerwood after saying "yeah." The court also concluded that during this search, Ledgerwood found nothing of value and returned the phone to Ater. Ater then opened a password protected folder containing pornography and scrolled through the file while officers looked on. The trial court concluded that officers did not have possession of the phone at that point, and Ater voluntarily showed officers the contents so it was not a search.

The trial court concluded that Ater terminated his consent before the second search, after he responded to the officers' request to relook at the phone with "I don't wanna." The court concluded the evidence obtained through this second warrantless search should be suppressed.

The State moved for reconsideration of the suppression order and for clarification surrounding which evidence was suppressed and whether it had the effect of terminating the State's case. The State also moved for an order permitting the admission of the contents of Ater's phone arguing that Agent Ledgerwood was able to seize the phone pending a search warrant the moment he observed the first criminal image and that the search warrant affidavit provided probable cause for a search warrant even in the absence of suppressed evidence.

The trial court denied reconsideration. In its order for clarification, the court stated that the suppression order did not apply to statements Ater made after his consent was revoked because there was no evidence those statements were the fruit of any unlawful search. Lastly, the trial court granted the State's motion to admit evidence reasoning that Agent Ledgerwood viewed the suspected images of child pornography before there was a revocation of consent. The trial court concluded that the search warrant affidavit, independent of the information about the second unlawful image, provided probable cause to search the phone.

C

After Ater fired several attorneys, the trial court granted Ater's motion to proceed pro se. After a bench trial, the court found Ater guilty as charged. Ater was sentenced to 13 months with credit for time already served. The court also imposed 36 months of community custody.

Ater appeals.

II

Ater first argues that the trial court erred when it declined to suppress all the evidence discovered during the warrantless search of his phone based on a consent to search. We disagree.

A

Article I, section 7 of the Washington Constitution provides, "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." The "private affairs inquiry is broader than the Fourth Amendment's reasonable expectation of privacy inquiry." State v. Hinton, 179 Wn.2d 862, 868, 319 P.3d 9 (2014). A search

occurs under the Fourth Amendment if the government intrudes on subjective reasonable expectation of privacy. Hinton, 179 Wn.2d at 868 (citing Katz v. United States, 389 U.S. 347, 351-52, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967)). In contrast, under article I, section 7, a search occurs when the government disturbs, "those privacy interests which citizens of this state have held, and should be entitled to hold, safe from governmental trespass absent a warrant." Hinton, 179 Wn.2d at 868 (quoting State v. Myrick, 102 Wn.2d 506, 511, 688 P.2d 151 (1984)).

We apply a two-step test to determine whether a violation of article I, section 7 has occurred: (1) whether the government intruded on a private affair; and if so, (2) whether the governmental conduct was justified by authority of the law. State v. Bowman, 198 Wn.2d 609, 618, 498 P.3d 478 (2021). "The 'authority of law' required by article I, section 7 is a valid warrant unless the State shows that a search or seizure falls within one of the jealously guarded and carefully drawn exceptions to the warrant requirement." Hinton, 179 Wn.2d at 868-69. Courts must suppress evidence obtained through an unconstitutional search. State v. Monaghan, 165 Wn. App. 782, 789, 266 P.3d 222 (2012).

We review the trial court's conclusions of law in a suppression order de novo. State v. Smith, 165 Wn.2d 511, 516, 199 P.3d 386 (2009). We review the findings of fact for substantial evidence. State v. Winterstein, 167 Wn.2d 620, 628, 220 P.3d 1226 (2009).

B

Ater first argues that he should have been given Ferrier warnings because the reasoning in Ferrier applies to an intimate device like a phone. We disagree.

Ferrier warnings are required in a "knock and talk" situation, which is an "inherently coercive" situation when police officers come to a suspect's door without a warrant suspecting illegal activity but lacking probable cause to search, and they ask for consent to enter and search the home. State v. Leupp, 96 Wn. App. 324, 333-34, 980 P.2d 765 (1999) (quoting State v. Ferrier, 136 Wn.2d 103, 115, 960 P.2d 927 (1998)). In these situations, an officer must also inform the person from whom they seek consent that the person may lawfully refuse to consent to the search, may revoke consent at any time, and can limit the scope of consent to certain areas of their home. Ferrier, 136 Wn.2d at 118.

Washington courts have consistently declined to extend Ferrier to searches outside the home. See, e.g., State v. Mercedes, 4 Wn.3d 410, 564 P.3d 971 (2025) (declining to expand Ferrier protections beyond the home); State v. Witherrite, 184 Wn. App. 859, 864, 339 P.3d 992 (2014) ("The cited history of Ferrier and our court's treatment of the home as most deserving of heightened protection under our constitution leads us to conclude that Ferrier warnings need not be given prior to obtaining consent to search a vehicle"); State v. Tagas, 121 Wn. App. 872, 878, 90 P.3d 1088 (2004) (Ferrier warnings not required to search a purse).

Because of the lack of case law extending Ferrier, and the Supreme Court's recent decision in Mercedes, we conclude that Ferrier warnings were not required.

C

Ater next argues that the State failed to demonstrate that Ater freely and voluntarily consented under the totality of circumstances. We disagree.

One recognized exception to the warrant requirement is voluntary consent. State v. Budd, 185 Wn.2d 566, 573, 374 P.3d 137 (2016). "The State must meet three requirements in order to show a valid consensual search: (1) the consent must be voluntary, (2) the person granting consent must have authority to consent, and (3) the search must not exceed the scope of the consent." State v. Reichenbach, 153 Wn.2d 126, 131, 101 P.3d 80 (2004). Here, Ater had the authority to consent because the cell phone was his, and the search was limited to the information on the cell phone. Thus, we examine only whether the first requirement was satisfied.

Whether consent is voluntary is a question of fact and depends on the totality of the circumstances. Reichenbach, 153 Wn.2d at 132. The totality of the circumstances includes (1) whether police gave Miranda[3] warnings before obtaining consent, (2) the degree of education and intelligence of the consenting person, and (3) whether the police advised the consenting person of their right to refuse consent. Reichenbach, 153 Wn.2d at 132. Additional factors that the court may consider are whether the person was cooperative or refused consent before granting consent, express or implied claims of the authority to search, prior illegal police action, and police deception as to identity or purpose. State v. Dancer, 174 Wn. App. 666, 676, 300 P.3d 475 (2013); State v. Flowers, 57 Wn. App. 636, 645, 789 P.2d 333 (1990). No single factor is dispositive. State v. Ruem, 179 Wn.2d 195, 207, 313 P.3d 1156 (2013).

Here, the totality of circumstances supports a finding of voluntariness. Although officers did not provide Miranda warnings, or advise Ater that he could withhold consent,

---

[3] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

that does not preclude a finding of voluntariness. Flowers, 57 Wn. App. at 645. First, Ater said "yeah" in response to whether he minded if officers looked at his phone and handed his phone over. This statement conveyed to officers that he agreed to a search prior to his subsequent withdrawal of consent.

Second, an officer's testimony regarding consent may support a finding of voluntary consent and is subject to a credibility determination by the court. Flowers, 57 Wn. App. at 646. Here, Agent Ledgerwood testified that Ater's consent appeared to be voluntarily given and that he did not make any threats or claim that he would search his phone regardless of whether consent was given. This weighs in favor of finding voluntariness.

Third, Ater cooperated with the police throughout the entire encounter. Additionally, during the encounter, Ater mentioned that he did not want to disclose information about some relatives. This demonstrates that Ater was aware of the ability to refuse consent. And later Ater did revoke consent, again demonstrating that he knew he did not have to consent to the search.

Fourth, officers explicitly told Ater that they did not have a warrant and it would not be guaranteed they would receive one. Similarly, officers told Ater that he was free to leave at any time and the doors were unlocked. They did not misrepresent their authority or explicitly threaten to get a warrant if he refused consent.

Ater argues that the State presented no evidence of his degree of education and intelligence, pointing to Ater's testimony that he attended special education classes throughout school. But in response to whether Ater was unable to understand what was happening, Agent Ledgerwood testified that he felt it was a "clear conversation." Agent

Ledgerwood also testified that Ater did not appear inebriated in any way and that he did not smell any intoxicants or the odor of cannabis. And after hearing testimony from both Ater and Agent Ledgerwood and listening to the recording, the trial court found that Ater had the ability to provide consent and was not perceptively impaired by substances or a mental disability during the contact with the officers.

Based on the totality of the circumstances, we conclude the trial court correctly found that Ater voluntarily consented to the first search, until the time he withdrew his consent.

III

Ater argues that his constitutional rights were violated when he was ordered to be restrained for multiple pretrial hearings, trial, and sentencing, without an individualized determination of need. We conclude that while the trial judge should have conducted an analysis on the need for restraints on the record before each hearing, Ater has not shown prejudice.

A

In July 2022, the State requested that Ater be shackled because of an incident inside the jail where Ater allegedly kicked two deputies. The trial court concluded that compelling circumstances existed and ordered Ater to be restrained while in the courtroom.

After that, there were several more pretrial hearings where the record is unclear whether Ater was shackled. During a hearing on September 19, 2022, Ater, then pro se, asked the trial court to remove the restraints. The court addressed Ater's motion at the next hearing but subsequently declined to remove shackles at the following hearing.

On September 22, 2022, Ater again objected to being restrained. He disputed the jail incident and noted that he was charged with a nonviolent crime. The trial court ordered Ater remained shackled finding that compelling circumstances existed.

On October 18, 2022, Ater requested to be unshackled. The trial court concluded that Ater could have one hand unshackled. During a hearing on November 7, 2022, Ater noted his feet and hands remained shackled and it made it difficult for him to organize his paperwork and the court ordered that his right hand remained unshackled.

During a hearing via Zoom on December 20, 2022, Ater asked to be fully unshackled in order to present a defense during future in-person court hearings. The court explained that the pretrial shackling order would not necessarily apply when he appeared in front of a jury. The State explained it wanted to receive a report from the jail on his behavior and the trial court revisited the restraints later after more information.

On December 30, 2022, the State told the court that the jail no longer felt restraining Ater was necessary. Ater noted that he continued to have waist and leg restraints. The court concluded that no compelling reason existed to restrain Ater above the waist.

At the start of Ater's bench trial, the court noted he was in civilian clothes and not handcuffed. The issue of shackling did not come up again.

B

A defendant has a right to appear in court free from unjustified restraints. State v. Luthi, 3 Wn.3d 249, 256, 549 P.3d 712 (2024). It is well established law that a defendant cannot be physically restrained "unless some impelling necessity demands

-12-

the restraint." Luthi, 3 Wn.3d at 256 (quoting State v. Williams, 18 Wash. 47, 51, 50 P. 580 (1897)). A trial court must engage in an individualized inquiry into the use of restraints before every court appearance to determine whether restraints are necessary for courtroom security. Luthi, 3 Wn.3d at 256.

Washington courts have identified several factors that the trial court should consider when determining whether a defendant should be shackled:

> [T]he seriousness of the present charge against the defendant; defendant's temperament and character; his age and physical attributes; his past record; past escapes or attempted escapes, and evidence of a present plan to escape; threats to harm others or cause a disturbance; self-destructive tendencies; the risk of mob violence or of attempted revenge by others; the possibility of rescue by other offenders still at large; the size and mood of the audience; the nature and physical security of the courtroom; and the adequacy and availability of alternative remedies.

State v. Jackson, 195 Wn.2d 841, 850, 467 P.3d 97 (2020) (quoting State v. Hutchinson, 135 Wn.2d 863, 887-88, 959 P.2d 1061 (1998) which Jackson abrogated in part on other grounds). We review the trial court's decision of whether to shackle for an abuse of discretion. Jackson, 195 Wn.2d at 850.

Although it is unclear from the record how often Ater was in restraints, the trial court did not engage in an individualized inquiry before each court appearance. This was error. Therefore, we move directly to prejudice.

The State bears the burden to prove that unconstitutional shackling was harmless beyond a reasonable doubt. Jackson, 195 Wn.2d at 856.

Here, the State argues it was harmless beyond a reasonable doubt because (1) Ater was tried in a bench trial, not before a jury, (2) there is no evidence the judge was inflamed by prejudice, and (3) unrebutted testimony proved the crime. We agree.

-13-

The unrebutted testimony at trial demonstrated Ater committed the crime as charged. Although judges are not immune to the prejudicial effect of viewing an accused person in restraints, there is no evidence that Ater's shackling prejudiced his bench trial. There is also no evidence that Ater objected to being shackled at trial.

Although the shackling was initially justified through the jail incident, it was error for the trial court not to conduct an independent analysis before each court hearing. We conclude, however, that the error was harmless beyond a reasonable doubt.

IV

Ater argues that the VPA and DNA collection fee should be waived. The State agrees the VPA and DNA collection fee should be waived on remand.

In 2023, the legislature amended RCW 7.68.035 to prohibit courts from imposing the VPA on indigent defendants as defined in RCW 10.01.160(3). LAWS OF 2023, ch. 449, § 1. Our courts have held that recent amendments to statutes governing legal financial obligations apply to matters pending on direct appeal. State v. Ellis, 27 Wn. App. 2d 1, 16, 530 P.3d 1048 (2023).

We remand to strike the VPA and DNA collection fee.

V

Ater submitted a SAG for review under RAP 10.10. We address his additional grounds in turn.

Ater first asserts that the trial court violated many of his constitutional rights by sentencing him to 36 months of community custody because he had already served 52 months.

-14-

State v. Jones, 172 Wn.2d 236, 257 P.3d 616 (2011) is instructive. There, the Supreme Court held that an offender who had been confined longer than the original period of confinement was not entitled to credit the excess time in confinement toward an outstanding period of community custody. Jones, 172 Wn.2d at 245-46. The court reasoned that allowing such a credit would conflict with the statute requiring tolling of community custody during confinement and it would contravene the Sentencing Reform Act's definition of "community custody" as the time actually spent under supervision in the community.[4] Jones, 172 Wn.2d at 244-46.

Under Jones, the trial court did not err in sentencing Ater to 36 months of community custody.

Second, Ater argues the trial court erred by failing to suppress all the evidence that the State refused to disclose by required omnibus order. Because Ater does not explain what evidence was not disclosed or what the State should have disclosed, we disagree. RAP 10.10(c) (we will not consider a SAG if it does not adequately inform the court of the nature and occurrence of the alleged errors).

Third, Ater argues that the trial court erred in denying his motion requesting bill of particulars. The court denied the motion reasoning that Ater did not sufficiently explain why he was not on notice of what the charges were or what needs to be clarified. For the same reasons as the trial court, we disagree.

Fourth, Ater argues that the trial court erred in failing to require the Department of Corrections to file a presentence investigation (PSI) before sentencing.

---

[4] Sentencing Reform Act of 1981 ch. 9.94A RCW

At sentencing, the State stated that it ordered a PSI but it had not yet arrived. The trial court decided:

> I'm not going to wait for DOC. The range is 14 months, and Mr. Ater has been in jail for well beyond that…I can't imagine DOC would have anything helpful to add, given where we are.
>  . . . .
>
> [A]nd I'm not sure why we don't have the presentence investigation report, but the ruling on this trial was over a month ago, and an order for the PSI was entered on March 7th, so it certainly is plenty of time for DOC to provide us with something.
>
> But at this, Mr. Ater's trial, we're getting right up on the time period when he should be sentenced, and just given the fact that, as we discussed a number of times, Mr. Ater has more than served his in-custody time, I'm not going to further delay this for a report from DOC.

The trial court then sentenced Ater to 14 months in prison with 36 months of community custody. Ater does not point to any authority that requires the DOC to have filed a PSI before sentencing. For that reason, we disagree.

Fifth, Ater argues that the State's closing argument was improper because the prosecutor made nontestimonial statements but there was no expert testimony nor witnesses or medical records. Because Ater does not point to specific statements that were improper and because he did not object, we disagree.

Sixth, Ater argues the State violated his Brady rights. A Brady violation occurs when a prosecutor suppresses "evidence favorable to an accused . . . where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady v. Maryland, 373 U.S. 83, 87, S. Ct. 1194, 10 L. Ed. 2d 215 (1963). Ater does not explain what evidence may have been suppressed or what resulting prejudice ensued. For that reason, we disagree.

Seventh, Ater argues the State committed misconduct by not disclosing all of discovery until the day before trial.

Before and during trial, Ater filed several motions surrounding alleged discovery violations. Shortly before trial, Ater sought and received a subpoena directed to Agent Ledgerwood. Agent Ledgerwood provided documents that were responsive, but the State had not reviewed some of the documents and learned that some items had not been provided to Ater as part of discovery. After trial, Ater moved to dismiss the case for discovery violations. The trial court ruled:

> [W]hen we became aware that there were some new items that were being disclosed to you, there were multiple offers to continue the trial date to give you, Mr. Ater, more time to respond or make a determination if that changed something with respect to your trial strategy, and that was declined every time it was offered. As was the offer for release on recognizance, to have more time to address this.

> I can't find that there was any prejudice to Mr. Ater in this late discovery, based on the offers—multiple offers of continuances and the fact that none of this was used a trial . . . And that Mr. Ater had plenty of time to talk to these witnesses. . . . There's been no evidence presented to suggest that there was anything about these documents that was exculpatory . . . So I just can't find that there was any basis for [a violation of CrR 4.7] because these were not documents that were within the prosecutor's control.

As the trial court explained, there was no prejudice to Ater for the late discovery. The State offered options to cure the late discovery, but Ater declined. The documents were also not in the State's control. For those reasons, we disagree.

Eighth, Ater argues the trial court erred in failing to arraign him on the first and second amended information. Ater does not explain resulting prejudice or provide authority to support his contention. For that reason, we disagree.

-17-

Ninth, Ater argues the trial court violated his constitutional rights by relying on a probable cause statement when those charged were later dismissed. As discussed above, the search warrant provided an independent source for probable cause for the charge he was ultimately tried for. Ater does not cite authority to support his argument. We disagree.

Tenth, Ater argues that the trial court erred in finding him guilty because the State did not prove possession. Ater asserts that the phone was not examined by the court so possession could not have been proven. There was testimony from both Agent Ledgerwood and Detective Nuefeld that they viewed the criminal images on Ater's cellphone. There was no testimony presented that disputed whether it was Ater's phone. For that reason, we disagree.

Lastly, Ater argues that Detective Nuefeld violated his constitutional rights when he searched the cell phone by himself without anyone else present. Ater does not present authority that prohibits this or explain how he was prejudiced, and for that reason, we disagree.

We remand for the limited purpose of striking the VPA and DNA collection fee. We otherwise affirm.[5]

---

[5] After multiple extensions, Ater filed his opening brief on May 31, 2024. The State filed its response on September 24, 2024. On October 31, 2024, Ater asked this court to file a supplemental brief with additional assignments of error explaining that while drafting the reply brief, he identified additional meritorious issues. Commissioner Koh accepted supplemental briefs for filing and passed to the panel the decision to consider or address the supplemental issues. Ater raised five new assignments of error in his supplemental briefing.

We decline to consider the issues raised in the supplemental brief because the brief was untimely and defense counsel fails to present compelling reasons for the failure to present the arguments in his opening brief.

_Mann, J._

WE CONCUR:

_Birk, J._                                _, ACJ_